Good morning, owners. I'm Alex Gambrell, and I'm here on behalf of Benito Vasquez, the plaintiff appellant in this matter. This is a retaliatory wrongful termination. So that was the last claim that wasn't dismissed. And Mr. Vasquez is asking this court to reverse and remand a finding of summary default or default judgment by the Western District of Washington, Honorable Benjamin Settle. So let me ask this, counsel. Let's assume that on behalf of your client you established a prima facie case of retaliatory termination. The county says they had legitimate, non-retaliatory reasons for discharging your client, namely that he falsified information on his employment application, made threats to fellow employees, and fabricated incidents of misconduct by others. What proof in the record is there that those reasons were pretextual? Well, basically, Your Honor, what Mr. Vasquez's position is, is that really the three reasons that the employer is given for his termination were, one, the false information on his unemployment application, which was not false at all. And I believe in the record we've cited to his declaration, as well as we put school records in there, that back in 1960s, or the late 60s when he went to school, some 40 years later he's applying for this job, he was asked, you know, the education wasn't a prerequisite for the employment in the first place. However, he, to the best of his knowledge, he said, you know, I have, you know, four years of college education. One thing that wasn't clear in the record to me is were those facts of the falsification known at the time of the termination, or were they discovered after? Well, when it was discovered by the employer, Mr. Vasquez filed Let me just answer my question simply, because I have a hard time, I ask what I think is a simple question, and then I get a speech, and by the time the speech is over, I don't know what the answer was. Well, the short answer is Let's answer it first. Yes. The question is, were the facts of the falsification of the employment application known at the time of the termination, or were they discovered after? They were known by the employer at the time of the termination. Thank you. Now, if you want to elaborate, go ahead. I would like to, because it's really the basis of his actions. In June 2005, he filed an action in district court, federal district court. He served it in August 2005. Immediately, the employer, because, you know, seen in the record, there's a history for this, the employer, from our position, wanted to fire him, wanted to get rid of him. They basically were looking for any reason they could whatsoever to get rid of him. So at that time, they looked at his application and sent letters to schools looking for any reason to fire him. And what they found is that, well, initially they sent a fax indicating that, please, I believe it was San Jose State or something like that, please verify whether Mr. Vazquez went to your school during this time. And they sent back a fax saying, we have no record of it. They didn't inform Mr. Vazquez they were checking out. If they would have, he would have been able to fill them in on more of the facts. Didn't the employment application itself give, by signing it, didn't he give the county permission to investigate the matters on the form and if they turned out to be false, that he could be discharged? Didn't he acknowledge that? I believe so. And if they would have done it when he was, if it was a prerequisite for employment and they would have done it at that time, it wouldn't have been an issue to us. But the fact of the matter is they did it immediately after getting served with the federal action. They started looking for any reason whatsoever to terminate him. And the reality of it is they sat on this information. They got information back from the schools in August indicating that he allegedly falsified it. We don't, you know, it's our position that it wasn't false at all. They sat on this information until, you know, throughout the federal litigation process until a deposition I believe in February of 2006. And at that time they basically confronted Mr. Vazquez to basically try to, you know, get him to lie in her deposition. I mean, but he was speaking from memory 40 years ago about what education he did. He had a lot of military education to her equivalents. And they basically sat on this information for six months without asking him for any explanation. And then once they got the deposition in the federal litigation, they decided now we can terminate him because, you know, they still at that point didn't confront him with it Let me ask you another question on a different matter if you're finished. I mean, I don't want to stop. Yeah, no problem. I read through Delano's or Delano, I don't know how you say that, testimony. And I guess I'm trying to figure out where in his testimony he actually says that the county was waiving an EEOC complaint or report at the pre-termination hearing. I read through the testimony, and I can read about a stack of papers, and I can read about a reference to them as serious allegations, but I don't find anything in there about the EEOC complaint or report. Are you asking where Mr. Vazquez indicates that the EEOC? Well, I'm asking, I mean, it seems to me you have to rely on that testimony in some way to prove your prima facie case about causation, and yet when I read the testimony of the person upon whom you really rely, I can't find anything that he even was referencing an EEOC complaint or report. No, he really, you know, and that's sort of an issue that's made here. He uses the term EEOC or complaint with his federal action complaint all sort of combined, and he, in his declaration, I believe it was made an issue by opposing counsel there, that he clarified later on in his declaration indicating that he remembers the EEOC being mentioned, but really what happened in that meeting was his supervisor became very angry and started waiving a stack of papers. And he, but so he didn't necessarily say EEOC complaint or it wasn't really clear. He said it sometime during that time, but really he was saying, I'm firing you because of all these complaints you've made. Well, then if in fact that's the truth, that we really can't say from that testimony that anybody said EEOC complaint or report, that essentially in the causation link for you establishing a prima facie case leaves me with your client's testimony. Isn't that correct? Well, I believe Mr. Leno's testimony as well, she indicated. Well, but Mr. Leno doesn't say that she was going for necessarily the EEOC charge and complaint. Her testimony just says, well, unless you've got a place that I couldn't find. My worry is that based on reading the testimony, getting into the record, I was left with, frankly, just your client's testimony. And my question, frankly, then, is that enough to make a prima facie case for summary judgment? I believe it is. Why? What case would tell me that? Well, I believe in, when I cite it in my brief here, it basically says, well, I didn't find it, so that's why I'm putting you on the spot. Well, what I'm looking for here is, maybe I can't see this. I mean, my worry is this, while you're looking. The simple fact that an employer learns of some of your client's conduct during some proceedings doesn't seem to me to be enough to be a link between the protected activity and the termination. So I'm trying to come up with something more so that I can get me off of the prima facie case. Okay, well, if you want to just give that to me, think about it while the other counsel is coming up here, that's fine. All right, maybe we'll save that for rebuttal and I'll find it during. Thank you. Or come up with it. May it please the Court, I'm Shannon Phillips of the Summit Law Group on behalf of Kitsap Transit. If I can speak right away to that point that Your Honor raised. You know, Mr. Vasquez in his complaint said that Mr. Harrington held up a copy of the EEOC complaint and told the plaintiff that the complaint was the reason that he was being terminated. If we had that evidence in the record, that would be direct evidence of a discriminatory or in this case retaliatory intent. Exactly true. The Court has said, for example, in the Godwin v. Smith-Wesson case, that for there to be direct evidence, it has to be evidence from which you can find that retaliatory or discriminatory intent with no assumption or inference. So, for example, you look at the Chuang v. UC Davis case. That was a case where the allegation was discrimination based on Chinese national origin. Well, the evidence in the record was that decision makers had made comments like, we already have two chinks in our department. They had said, you should pray to your Buddha. That's the kind of direct evidence that you don't have to have assumptions to find discriminatory intent. For example, in the Cordova case, that's a case where decision makers said, referred to dumb Mexicans, and said, we can't even look at a white man when hiring. Well, when someone is saying there's discrimination in hiring or promotion, that's the kind of direct evidence. But what we have in the record is we have both the declaration only and deposition testimony of Mr. Vasquez and the declaration of Ms. Dieno. None of the statements in those declarations or depositions give you that direct evidence. Mr. As Your Honor pointed out, Mr. Vasquez, in his declaration, after he had said in his deposition he had no specific memory of Mr. Harrington saying that the EEOC complaint was the reason for his termination. In his declaration, he said, at the pre-termination hearing, Mr. Harrington specifically stated that I was being terminated because of all the complaints I've made against Kitsap Transit. I recall him actually using the term EEOC at some point. Well, it's undisputed that the EEOC and litigation were discussed at that pre-termination hearing because Mr. Vasquez and the union were taking the position that the employer could take no action based on anything that was revealed in that process. So the fact that in the court-ordered call, Mr. Vasquez became incredibly animated about supposed physical attacks upon himself and said that his first reaction was to go home and get his gun and come back and do some killing. The union and Mr. Vasquez are saying, that was in a protected process. You can't act on that. The fact that in the report that he disclosed in response to discovery requests from these individual employees whom he had asserted claims of assault and battery against, he reveals this report, and in that report he makes similar comments where he says, I'm going to kill each and every one of you, and first I'm going to hurt everything you love. Mr. Vasquez is saying in this pre-termination hearing, can't rely on that. That's part of the EEOC process. Mr. Vasquez's lawyer has said in his brief it doesn't matter what was being waved around. It doesn't matter if it was the lawsuit. It doesn't matter if it was the EEOC complaint. It doesn't matter if it was Mr. Vasquez's report. That's the issue for the court today, is when an employer learns of offensive, threatening, dishonest conduct in the course of or in conjunction with protected Title VII litigation or an EEOC complaint, are they paralyzed from acting on that information? Neither Title VII nor the cases of the Ninth Circuit would prohibit such action for sound public policy reasons. An employer cannot stand by while this kind of misconduct happens simply because someone has engaged in protected activity. I've already talked about the direct evidence and the lack of any direct evidence in the record. Mr. Vasquez says he also has circumstantial evidence. What he points to is a series of events that he says are a chain of events, all of which show retaliatory intent to terminate him because he engaged in protected conduct. Now, we have said he certainly can't assert liability based on these events. They were never asserted to the EEOC. His EEOC charge said simply, I was terminated because of my EEOC charge. He never said, I was sent to a psychiatrist for an evaluation. He never said they helped employees get protective orders. So there can't be a basis for liability. But he says, but they show intent and they should be background information for this court. Well, as the district court said, if you look at each and every one of those, you don't find retaliatory intent. Again, we have. So far as the falsification of the employment application is concerned, what does the record, from your perspective, disclose about when that was discovered? When they discovered that he had falsified it? Yes. It was discovered around August, which was after they had received a copy of the federal claims that he was in violation of Title VII claims and the claims against the individual employees. Had he been terminated at that point in August? No. So they did not act on that. They did. They were faced with, this is an employee who had filed an EEOC charge. There was no retaliation based on that. They responded to it. It went through the process. Then he filed a complaint of assault with local law enforcement. They didn't get any details about that, but they opened up their workplace to an investigation. They cooperated. There was a finding that there was no evidence to support an assault charge. Now in August, it receives a lawsuit in which he names three specific employees and unnamed other John Doe saying, these people assaulted me in the workplace. The employer has no evidence from anyone that these supposed assaults, which in later revelation in the report, are quite graphic and detailed, and it's the idea that no one knows about it is quite astounding. So the employer is puzzled and says, who is this guy? It doesn't seem like he's being honest about these supposed assaults. And so they look into his employment application and say, is he who he says he is? Was he honest there? They send away to the colleges, give the date of birth, social security number, the specific colleges that he put on his application. They give back two responses, we have no record of this person ever having attended. Now they don't then immediately terminate his employment. That's just something that, well, something's amiss here. But this, what follows is not the employer going to look for misconduct, that it can trump up some charge. It comes to the employer. The employer is in this court-ordered conference call, and Mr. Vasquez is the one who becomes animated and makes and reveals that he has this desire or had a desire to harm or kill his fellow employees. Mr. Vasquez reveals his report of supposed atrocities that happened against him. And so the falsification, this is the information they have, is that there's no record of having attended. And even when they go to the pre-termination hearing, Mr. Vasquez at that point, he's given notice in the pre-termination letter that this is one of the grounds. This is an example of the dishonesty, which is dwarfed by the dishonesty that they find in this report. But this is one example. Does he at that meeting say, well, I'm sorry, I have these military records, or maybe you need to check under a different name, it was a long time ago? No. He refuses to answer and says, I don't have to answer any of this because I'm involved in Title VII litigation. I'm going to leave it to the courts. So Mr. Vasquez makes no effort at that point to try and give information or to say, like opposing counsel finds evidence of retaliatory nature that he wasn't given more time. He never asked for time. What he did was three years later, in response to summary judgment, for the first time he never even revealed it in discovery. In response to summary judgment, he submits military records, which he now says show an equivalent educational background that makes it not a lie. He says he didn't reveal those earlier because he thought they were top secret military records. That doesn't show that the employer's stated reason was false or pretextual. They had the information they had. The fact that three years later somebody gives some different information that might have led them to a different result does not show that it was false or pretext for a retaliatory motive at the time. I expect that you're going to suggest that there's no evidence to establish that the stated reasons were pretext for the retaliatory motive. However, you understand, and we have just recently ruled, that the amount of evidence required to demonstrate that, but there's a genuine issue of fact about the pretext, is very minimal. Given what you've said here today, have they reached that level as to a pretext? No, because there's nothing to show that the three stated reasons were not genuinely believed by Kitsap Transit beyond Mr. Vasquez's subjective opinion. So first, again, we have the educational credentials. They relied on what they knew. There's no evidence they knew anything differently or that they didn't believe that at the time. The second is the threats to harm or kill. Mr. Vasquez says that those are pretextual because he never actually hurt anybody. And second, because one psychiatrist said that he was currently confident in the litigation process and that he didn't see any acute risk. Well, as an employer, Kitsap Transit looked at these statements about wanting to go get my gun. I have a gun and feeling like I want to get it and do some killing and was not comforted by one psychiatrist saying he's confident right now in the litigation. What happens when summary judgment is granted? If, in fact, one would suggest that just the timing of when they really went to find this information regarding whether it was falsified on his employment application would suggest it's retaliatory, does your client have an opportunity to show that it would have terminated the plaintiff in any event for legitimate reasons? Yes, that's an affirmative defense, and under at least thus far in the Ninth Circuit, if you look at the Funai case, which is a district court case, it says that the same decision defense is applicable in retaliation cases. Kitsap Transit put in declarations from two individuals saying, we would have reached the same decision based on the so leave aside the education credentials, we would have reached the same decision based on the threats to harm or kill fellow employees. Some would suggest that the 1991 Act overrules that kind of an idea. Well, there isn't Ninth Circuit, there isn't a Ninth Circuit opinion saying that the 1991 Act overruled it with respect to retaliation cases. And we at least have in the Funai case one district court saying, this is what lots of other courts have done throughout the country. They've realized that Congress could have amended the Act to extend a retaliation and it didn't, so this defense is still applicable in retaliation cases. Thank you. You're welcome. Thirteen seconds. Really, I'd just like to point out, Your Honors, that on, it was Poland, what's that? Go ahead. Poland v. Chertoff is what I cited, basically just saying the causal link element is construed broadly. And, of course, the test on summary judgment is it's the right and most favorable to the appellant. And if you look, it's, actually I'll just give you the sites of ER 210 and 203 is the declaration of Rita Delano, and where she does indicate Mr. Harrington waved a stack of papers in there while indicating that these were very serious charges made by Mr. Vazquez against the employer. I guess the point there is, is what other complaints have been made? There hasn't been any. It's either all the complaints in the federal lawsuit or the EEOC complaint, and he's specifically saying we're firing you because of this. All right. Thank you. All right. Case 09-35480, Benito-Vazquez v. Kitsap County Transit is here submitted. We'll now move to Christina Russell v. Comcast, case 09-35435. Thank you. Thank you for your argument. I'd like to reserve three minutes. Good morning. Good morning. Michael Jacobson. It's my privilege to represent Christina Russell in this important ERISA case concerning a series of procedural and substantive ERISA violations. Three of the most important issues require this court to stand in the shoes of the district court and determine Rule 56 matters anew. First, did the short-term disability administrator rely upon clearly erroneous findings? Second, did the long-term disability insurance administrator surrender its reserve discretion and cede to the district court the right to determine the long-term disability benefits by conducting a long-term disability determination without notice or inviting Russell's participation? And three, did the... She never did get to long-term disability, did she? Excuse me, Judge? They never did get to long-term disability, did they? It's our position that a determination of long-term disability was made with a question and posed about long-term benefits post-dating February 7, 2005, which was the sunset date at which the short-term plan ended and transitioned into the long-term plan. The question was posed by the appeals administrator, does she have any long-term impairment after February 7, 2005 to the present? The answer was given, no, she doesn't. Her input was never invited. There was no record assembled of her condition after February 7, 2005. The unambiguous import of that question is to focus on the long-term disability period because the short-term disability period had sunsetted already. I understand your argument, but the honest truth is that your client was terminated prior to getting to long-term. Isn't that correct? She was. She was terminated before she acquired the six months. Our position, of course, is that it's arbitrary to rely upon clearly erroneous findings in doing so. It's also arbitrary. It's a breach of a risk. So are you really suggesting then that the standard of review for the district court, as well as for us, is an abuse of discretion? This is a reserve discretion, Administrator Judge. I don't think there's any question of that. And so the questions are framed, is this an abuse of discretion to rely on clearly erroneous findings to cut off short-term disability? Is it a fiduciary breach under 1104A1D to fail to adhere to and exhibit inconsistent application of the written plan standards under ERISA? I think a fourth issue will arise if the court declines to reverse on these other issues and decides to remand the district court to start anew the questions, which is must the district court in that reevaluation apply a highly skeptical standard of review to this claim denial based on procedural. I guess I'm trying to figure out how I get to this highly skeptical standard of review when in this particular situation, Comcast has the plan. Comcast has a final discretion, but in this case never used it ever. And in fact, Broadcast makes the discretionary decision here. Why is it that I have to be skeptical about that? Broadcast doesn't have anything to do with funding the plan, short-term plan. There is absolutely nothing that Comcast, who does this plan, does. They just sit there, Broadcast makes all the decisions, and Broadcast has absolutely no responsibility for the funding. Where am I going to get to skepticism as a review? Judge, there are two answers to your question. One is the premise that I think you've advanced is a false premise. And the second is I think it's an error. What's false about it? The short-term disability administrator, Comcast, funds the plan. They name themselves the administrator of the plan. They have the discretion. They retain their discretion to amend the plan. They retain their discretion to take back any benefits that are awarded. In their discretion, they want them back. Well, but the bottom line is, when you go through all of that, the bottom line is the best they can do is undo what's done by Broadspear if, in fact, they don't think it's correct. And in here, they made no decisions. Broadspear made every decision. They made one decision, Judge, which was to do so. They made two decisions. They, first of all, granted her short-term benefits. And, second of all, they revoked them. That's Broadspear. Comcast made the decision to delegate their decision-making authority to the one entity in the free world that would profit from cutting off somebody's short-term benefits before it got to six months, which is Broadspear, because they ensure the long-term benefits. Is there a case that suggests that in that situation, all of a sudden we should jump to reviewing this abuse of discretion with skepticism? What's the best case? That proposition alone I don't think has the courts been confronted with yet. Okay, that was my question. That's not the only proposition that, of course, affects the skepticism of the review, a procedural violation according to the out-of-bank decision of Abbate also requires the court to increase the skepticism and the incredibility with which they look at decisions. What role does Montour play in this? Montour. Is that the name of the, am I not pronouncing the name of the case correctly? I'm not recognizing the case, Judge. Oh, all right. That's all right. I think in addition to it being a question where you do raise the skepticism, Judge, I think our first premise is that if this court stands in the shoes of the district court and applies the least skeptical review standard possible, as the district court did, the standard under least skeptical review stated in Boyd v. Pete Rozelle is that a clearly erroneous finding of fact relied on by the administrator is an abuse of discretion. Let me ask you another question. This question I've asked in other cases, so it's kind of a question I have on my mind. If, in fact, the district court was to do this on an abuse of discretion, what is my standard in front of me? Is it another review the district court's decision under an abuse, or is it de novo abuse of discretion of the underlying decision? When the, on appeal of a summary judgment ruling, this court stands in the shoes of the district court and applies Rule 56 standards anew. The standards that the district court applied, this least deferential or least skeptical standard, can be applied by this court, and in the case of a clearly erroneous finding that has been relied on by the administrator must reverse for an abuse of discretion. I'd like to address that point, Judge, because I think it's telling. The facts are that the peer reviewer Mendelson asserted there are no symptoms of PTSD, post-traumatic stress disorder. This was in the final evaluation right before the appeal, the denial of the appeal, and it's clearly false. There are four telltale signs of PTSD. They're enumerated by the American Psychiatric Association. We've put their report in the record, their publication in the record at 206. Russell exhibited all four signs. She had the death experience of a gunshot murder. She had the reliving of images of that death experience. She had the isolation at home, avoiding stimulus. She had the hypervigilant agitation. Her speech was impaired. Her composure was impaired. Her motor processing was impaired. The peer reviewer said, well, let's look at just number four, agitation, because if she's a little agitated, she goes to work, and she can interact with people that's not a disabling condition, there's two assumptions that we must make. Number one, she's never been violent before, so it's likely she won't be violent even though she's agitated, so she can be among other people. Number two, we must assume she did not have the telltale signs of PTSD. The administrator bought this hook, line, and sinker. There is no account of PTSD anywhere in the administrator's decision denying benefits. There is no sign the administrator ever considered PTSD. There are two more false statements relied on. First, the peer reviewer says there is no presence in 2005 of panic symptoms, and there is no continuing presence in 2005 of hallucinations. These are clearly false. The January 21 chart, under consideration by the administrator, says she had an episode in her bathroom. She was dizzy. There's no organic sign. It's more like a panic attack. January 12, the chart entry says she had the image of a gunshot death, woke her from sleep, a nightmare. The administrator repeated Mendelsohn's assessment word for word and said, there is no presence in 2005 of panic attacks and hallucinations. Clearly false. Counsel, I think we're going to read the record, but let me ask you, what about abatis, since you wouldn't comment on Montour, what about abatis? What is the interplay of those two? You said you weren't familiar. The citation for Montour, incidentally, is 588 Fed 3rd 629 for your purposes. Now, abatis, are you familiar with that case? Yes, that's the en banc decision of this court, which pretty much changed the rules on it. Right, and how does that bear on this case? If the court does not choose to stand in the shoes of the district court, apply anew the standards of Rule 56, and decides they must remand to the district court for a reevaluation, abati tells us if there are procedural violations of ERISA in the record, that a heightened standard review must be applied, rather than the least skeptical standard that was adopted by the district court. And which of the standards should we be applying, the least skeptical or the heightened standard? My first reaction to And on what basis do you claim that we should be doing this? The court has two choices. One is you can stand in the shoes of the district court, apply the least skeptical standard review, and decide and apply Rule 56 standards to these false statements that were relied on and find this was a clearly erroneous decision by the administrator. Second, if the court believes that the standard review furnished by the district court was the wrong standard review because it finds that there was proof switching in this case, that there was a failure to attend to the important facts that were submitted, that's the Glenn versus Metro line of thinking. How do you contend and where do you contend that the district court went off the tracks in its decision? Where's the error? The administrator relied on clearly erroneous findings, which I pointed out, and the district court did nothing about it. They said that, in fact, our standard of review is simply the old Jackson, Acuson, Jordan, Atwood standard review, which has been overruled by Abbatey. And they said that our role is to simply check the record to see, is there information both supporting and refuting disability? And if there is, that's the end of our job. Clearly erroneous findings of fact completely eluded the district court's attention. They didn't pay attention because they applied the wrong standard of review. They need to be reversed on that basis alone for violating the correct standard of review that Abbatey proposes. But I believe they need to be reversed because this court can stand in the shoes of the district court and overturn that administrative decision under Rule 56. Thank you. I do want to say that the governing standard for the clearly erroneous findings is applying the actual stationary command in 503.1h.24 of the regulations. That standard says there is no full and fair review unless an administrator takes into account all information submitted by the claimant. That's the selective use of the evidence rule in Glenn v. Metro. It was stated perhaps best by this court in Boonton, which at 1463 said, Etna's rejection letters denied benefits without even acknowledging Boonton's argument that her back teeth needed to work on account of injury to her front teeth. This administrator failed to acknowledge that there was PTSD, there were panic attacks, there was intrusive images of death. They basically relied on this psychologist, Nettleson, to say, well, let's assume she didn't have that death experience, didn't relive it, didn't have the isolation in the record, didn't have the panic attack, didn't have the hypervigilant agitation and effects. Let's assume that's true. And, judges, there's a ---- My biggest problem, I guess, and you're running out of time, so I've hesitated to say, seems to me you make a great argument for factual situation that you believe was not effectively evaluated. But if I'm on an abusive discretion standard, even with some skepticism, you're suggesting to me that the facts that you present are so compelling that the other facts that this administrator looked at would be out of it in determining that this happened in this particular situation. And with an abusive discretion with skepticism, even with skepticism, which I think the district court applied here, and I'm not even sure they should have, I'm still trying to figure out what there is, what case I rely on to suggest that what happened here was abuse. Now, we're not talking arguing a great argument on one side and arguing a great argument on the other side and coming down on the different side. We're talking abuse. They just abused in what they did without looking at any further records that were not previously looked at by the administrator. The cases that you want to review then, Judge, are the Booten case of failing to acknowledge the argument. PTSD is nowhere in the record. There's no sign they ever thought of it. It's just the assumption that was made that let's just assume that the telltale signs of PTSD, which are sitting in that record that we're reviewing, don't exist. The second is the Black and Decker v. Nord case. The standards for Black and Decker v. Nord, now, there the Supreme Court said that the independent evaluator can be, we can give credence to that decision about a dissenting view on the medicals, if an insurance administrator tells us to, if their determination is credible and if they confront the issues that are raised by the treater. But, of course, it's not credible to say let's assume the events in the record didn't happen, and it's not confronting those events in the record, to say our first assumption is she didn't have the telltale signs of PTSD that are in the record, she didn't have the panic attacks she had, and she didn't have the hallucinations she had. Thank you. Your argument time is over. May it please the Court, good morning. My name is David Schmidt. On behalf of all of the defendants, I had a prepared outline, but I think I'll just jump right in about the post-traumatic stress disorder. You represent all of the defendants. You don't find any conflict at all between any of the defendants? No, and actually, Your Honor, you had it right. Comcast was the plan sponsor. They funded plan benefits. They hired a third-party administrator, Broad Spire, which is a separate company in Florida, to administer benefit claims both for the short-term plan and the long-term plan. The plaintiff's counsel is incorrect. The long-term plan was not benefits from the long-term plan would not have been funded by Broad Spire if it had gotten that far. The long-term plan was an insured plan insured by Highmark Life Insurance Company in Pittsburgh, Pennsylvania. Broad Spire is simply a third-party administrator. They are not an insurance company. So that's a very important point. With the post-traumatic stress disorder. Is it okay for you to represent them both? Yeah, there's no conflict. You mean the conflict between them? I mean, you're here arguing that there's this Berlin Wall, if you will, between Comcast, the funder of the plans, and the entity that evaluates claims under the plan. I'm not suggesting there's any ethical balance here. It just seems curious that you're up here arguing that they're completely separate and divorced from each other, yet they hire the same lawyer to argue. If you want, I'll explain the arrangement. Actually, I was... I want to also add, I didn't suggest any ethical... Okay, no, no, I didn't think you were. Because the complaint sought long-term disability benefits, it was ultimately the long-term disability carrier who took over the defense of the entire thing. So even though there was no long-term disability claim and no long-term disability determination, the long-term disability carrier is still defending the case and is basically billing the other parties for their portion of the defense. I understand. My colleague from the Tenth Circuit asked about Montour. Surely you're familiar with Montour. Surely I'm not, Your Honor. I'm sorry. Well, let me describe it, and I may have it wrong, and maybe we'll want some post-argument briefing on it. Montour concluded that there was a conflict on the part of the plan administrator in that case for two reasons. One, because the administrator failed to present extrinsic evidence of any part, effort on its part to assure accurate claims assessment, such as utilizing procedures to help ensure a neutral review process. That was one. The second thing, which may be more appropriate here, was they pointed to the fact that the administrator conducted a pure paper review by hiring directors to review Montour's files rather than conduct an in-person medical evaluation of them. Now, it is correct here, isn't it, that Broadspire simply did a paper review, right? It was a little more than that. There was no independent medical examination. There was a peer-to-peer consultation. This is a woman who went to a party with her boyfriend who was killed in front of her, right? I believe so, yes. Okay. And the treating physicians have concluded that she suffers from post-traumatic stress syndrome, right? That's correct. Okay. And that's the basis for her claim for short-term disability benefits, which Broadspire granted. Correct. And that's the basis of her claim for long-term disability, which Broadspire said no to. Well, no, there was never a claim submitted, so the Broadspire... Because she was gone by then. Right, because the STD claim was terminated prior to the end of the STD period, which is the elimination period for an LTD claim. If I could address the post-traumatic stress disorder issue... Well, first of all, do you agree that it was a paper review in the sense that there was no... It sounds like something's coming out of the ionosphere. We'll try to do it unaided. Okay. You seem to agree that it was a paper review in the sense that medical experts were reviewing medical records. She was not independently evaluated, correct? Correct. The difference actually was somewhere in the middle, though. The independent peer review physician retained by Broadspire did contact the plaintiff's physician and speak to the plaintiff's physician about her condition. If I was forced to in a post-argument briefing, I would distinguish the Montour case that way. It's Montour, M-O-N-T-O-U-R, against Hartford. And I think Judge LoCero gave you the site. Go ahead with your argument. All right. What I wanted to say was the diagnosis of post-traumatic stress disorder is kind of irrelevant because it's not the diagnosis. In any ERISA disability case, it's not the diagnosis which is important. It is the symptoms which are important. The symptoms which... The issue is whether the symptoms being experienced by the employee prevent the employee from performing the duties of their occupation. I thought it was going to be your argument here that there was evidence in the record that she didn't experience the paranoia and the hallucinations. Right. At the point that the short-term disability was terminated. That's correct. Her condition was... Was there a conflict on that point, or is that essentially a given? What is the status of the record on that point? I don't believe there's a conflict. And actually, I had this mapped out. The initial short-term disability claim was based on diagnosis of depression with panic attacks twice a week and hallucinations at night. And based on that and the medical records that were submitted with that, Broad Spire approved the claim. And Broad Spire received updated behavioral clinician statements throughout a four-month period or four or five-month period after that. And each time they got those reports, there were continued reports of hallucinations and panic attacks. Then in January, Dr. Roy, as the treating physician, submits another updated clinician statement where he marks N.A. for psychotic features and leaves the hallucinations and paranoia section blank. Somebody might try to say that that's maybe a mistake or an oversight, but he did deliberately put N.A. after psychotic features. And then in a letter that he wrote on January 28th, he said that the panic attacks had improved and that they rarely occurred anymore. And there was no mention at all in his January 28th letter of hallucinations. That's hardly dispositive, right? But under an abuse of discretion standard, I think it's enough evidence for a reasonable claims administrator who's relying on an independent peer review physician to look at this and say... Hardly occur anymore or they rarely occur? What did you say? He said it rarely occurred. Or happening rarely were his words. Right. There was no anymore. Right. He said panic attacks improved rarely occurred. Didn't he also conclude in the same letter that Russell still had sufficient depression to be disabled? Right, but he didn't list any... He said she was depressed, but he didn't say in his letter and he didn't say in his peer-to-peer consultation with Dr. Mendelson what it was that was keeping her from performing her job duties. I mean, lots of us get up in the morning and we're not feeling ourselves and we feel depressed, but we still go to work. The question is, was there something about her depression which was keeping her from working? Why don't you read the language? What did he say? What did Dr. Royce say? About depression in full. In CR 169 or so. Okay, hold on. Shoot, I had it with me. That's all right. You don't have it. He said, well, what he did say to... Oh, actually, I have Dr. Mendelson's report. He said that Dr. Royce had said that she was unable to work due to negativity, irritability, and possible physical damage. And then Dr. Mendelson evaluated the records and saw that there was actually no evidence at all in the medical records of her being violent, of her being threatening. There was nothing to support Dr. Royce's conclusion that this was the reason why she couldn't work. And I have to point out that this was the first time Dr. Royce, in any of his clinician statements or any of the records, had used irritability and threats of violence in the workplace as a basis for disability. Up until that moment, it had always been hallucinations and panic attacks, which arose out of the depression, which came from the post-traumatic stress disorder, which, as I was starting to say before, the post-traumatic stress disorder is simply a diagnosis. It's not the symptom. If you're diagnosed with cancer, that doesn't mean you can't work. If you have symptoms associated with the cancer which prevent you from working, then you're disabled. But the fact that you have post-traumatic stress disorder or cancer or anything else doesn't mean you're disabled. You have to have symptoms which prevent you from working, and that was the problem with this plaintiff's claim. She did not submit any medical records, and even her own physician didn't provide any information in the peer-to-peer consultation which reflected symptoms which would prevent her from performing her job. And under a de novo standard, you could sit here and say, well, I don't know, maybe there is enough evidence for disability, maybe there's not. But under a deferential standard of review, I don't see how it's possible that the court could find. And you're sitting as a de novo court now. I mean, you're looking at the file yourself as if the district court never had it. Dr. Roy's letter that we've been talking about, is that an ER-164? It might be. You know, I just had it and I can't find it now. Hold on. Oh, here it is right here. Yes, I have it. I'm sorry. Is it ER-164? Yes. Okay. That's fine. Yes. So should we be applying a heightened skepticism, slight skepticism, no skepticism? What is your best evaluation, what the status of Ninth Circuit jurisprudence is on that point? My position, or our position, is that the Jordan standard still applies, that there would be a complete unfettered discretion. That's a phrase we use in the Seventh Circuit. But that because of our review, you'd say we apply no skepticism at all? No, because there's no conflict of interest. Our position is that there's no conflict of interest because the claims decision was completely separated from the entity which was funding the benefits. Excuse me, can I ask this question? Dr. Roy's letter at the very end, I'm referring to ER-164, recommends that she have vocational rehabilitation? Yes. Was that ever done? I don't believe so. Does any of the evaluation by Broadspire deal with that? I don't think so, no. Because all they were doing was evaluating at the time whether she had symptoms which disabled her. Was Broadspire empowered to act on a suggestion like that? What would happen if Broadspire had gone through their evaluation and said, we don't think she's depressed to the point where she's disabled, but her treating physician is recommending some vocational rehab, and we think that's a good idea. Would that happen? Was Broadspire empowered to do that? I don't want to make something up. I'm just going to have to say I don't know. The answer is you don't know? I don't know. I believe so, but I'm not positive. And you've read all of the Broadspire records in this case, haven't you? Right. And there's no mention of, or is there any mention of this recommendation for vocational rehab? No. No, because by this time we're at the end of the evaluation. It's not there, right? Right. Okay. Right. And, you know, he doesn't even describe what kind of vocational rehabilitation she would get. And I'm not sure, frankly, as a layman, I'm not sure what kind of vocational rehabilitation you get for post-traumatic stress disorder. I'm thinking of when you have a bad shoulder, they get you out there and they do exercises. Well, what he says in the letter is that she's reporting some difficulties at work, but he has a hard time relating that. And her psychiatric condition seems greater or more advanced than those things currently are. And maybe the vocational rehab is to try to counsel her to bring those things back in order. But I think we've pretty much exhausted that. Okay. Thank you for your argument. Okay. Oh, I saw 30 seconds. I didn't know I was going the other way. You're in deficit spending, as he says. All right. Thank you very much.
judges: Lucero, Hawkins, Smith N. R.